**[J-15-2025] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| HOUSING AUTHORITY OF THE CITY OF PITTSBURGH, | : | No. 16 WAP 2024 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court entered |
| | : | November 20, 2023, at No. 1200 CD |
| | : | 2022, reversing the Order of |
| v. | : | Allegheny County Court of Common |
| | : | Pleas entered September 20, 2022, |
| | : | at No. LT-21-189. |
| DARLENE NASH, | : | |
| | : | ARGUED: April 8, 2025 |
| Appellee | : | |

**DISSENTING OPINION**

**JUSTICE WECHT**                                    **DECIDED: SEPTEMBER 25, 2025**

I agree that the underlying conduct of the shooter was "criminal activity" prohibited under the lease that Darlene Nash signed with the Housing Authority of the City of Pittsburgh.[1] The lease imposes strict liability upon tenants such as Nash for the criminal activity of "Covered Person[s]."[2] The question we must decide is whether the shooter was a "Covered Person" as defined in that lease. The lease's definition of "Covered Person" includes a "Tenant," "any member of Tenant's Household," a "Guest," or an "Other Person Under the Tenant's Control" ("OPTC").[3] The shooter did not meet the definition of a "Tenant," a "member of Tenant's Household," or a "Guest." Nash invited the shooter into her "Unit" by virtue of the open invitation to her house party. The Majority

---

[1]     HACP Lease, § 9(K)(2), R.R. at 21a.

[2]     Majority Op. at 10-11.

[3]     HACP Lease, § 2(C), R.R. at 12a.

concludes that the shooter was an OPTC as defined in the lease, which makes him a "Covered Person" as to Nash. Because I disagree with that conclusion, I would affirm the Commonwealth Court's order.

Before turning to the lease, I note a factual peculiarity that should give us pause: no one has been charged with the homicide that gave rise to this eviction. Apparently, while the suspect, although never publicly identified, is known to law enforcement, detectives have been unable to apprehend him. It appears that no arrest warrant has issued, and that no criminal information has been filed.[4] So, while authorities seem to have identified an as yet unnamed juvenile as the suspect, the investigation remains open or at least unresolved. With the shooter in the wind and uncharged, the Housing Authority nevertheless moved to evict Nash. Further investigation could reveal that the shooter did not believe that Nash invited him into her Unit. The shooter might have been on the Premises to visit his girlfriend and/or the child they share. The shooter might confirm that Nash, or the girlfriend, or neither of them, invited him onto the Premises. The Housing Authority has sought to evict Nash without resolution of these factual questions. It has yet to demonstrate that Nash invited the shooter onto the Premises. The record indicates that his girlfriend could just as easily have done so.[5] The question presented to this Court is, regardless of whether the girlfriend or Nash invited the shooter onto the Premises, can

---

[4]     *See* Majority Op. at 3 n.4.

[5]     The Commonwealth Court "determined [that the] record lack[ed] any evidence that [Nash] or a member of her household invited the [shooter] to the building complex. . . . To that end, even though there is no clear evidence that [the shooter] was on the Premises due to his girlfriend's invitation, the record is devoid of evidence that [Nash] invited [the shooter] to the Premises. In fact, the open nature of the event, which admittedly was not restricted by individual invitations, actually made it less likely that [the shooter] was on the Premises due to [Nash's] invitation, particularly since the mother of his baby lived next door." *Housing Auth. of Pittsburgh v. Nash*, 1200 C.D. 2022, 2023 WL 8009066, *4 (Pa. Cmwlth. Nov. 20, 2023) (unpublished) (internal quotation marks and citation omitted).

the Authority evict Nash?[6]  The Majority contends that the Housing Authority can evict Nash in any event.  I am unconvinced.

The Housing Authority of the City of Pittsburgh drafted the lease that we examine here.[7]  The lease defines OPTC as "a person, although not living as a Guest in the Unit, who is, or was at the time of the activity in question on the Premises, as defined below, because of an invitation from Tenant or another member of the Household who has express or implied authority to consent on behalf of Tenant."[8]  The lease defines "Premises" as "the building, or complex, or development in which the Unit, as defined below, is located, including Common Areas and grounds."[9]  By contrast, the lease defines "Unit" as follows: "the dwelling space intended for the exclusive use and occupation by the Household.  The Unit shall include any steps, porch, hallway, lawn, or yard adjacent to and reasonably considered to be part of the dwelling space."[10]  Put simply, the "Unit" is the tenant's individual dwelling, and the "Premises" is the entire housing development. The "Unit" is necessarily a subset of the "Premises."  The inverse is not true.  One can be present on the "Premises," such as the grounds, without being present in a particular tenant's "Unit."

The Majority posits that "[a]n invitation to a Unit **is** an invitation to the Premises," even though the two terms are defined differently in the lease.[11]  The plain language of

---

[6]  *Housing Auth. of Pittsburgh v. Nash*, 320 A.3d 669 (Pa. 2024) (*per curiam*).

[7]  The interpretation of the lease is a question of law, and our standard of review is *de novo.  Mace v. Atl. Refin. & Mktg. Corp.*, 785 A.2d 491, 494 n.5 (Pa. 2001).

[8]  Housing Authority of the City of Pittsburgh ("HACP") Lease, § 2(L), R.R. at 12a-13a.

[9]  *Id.* § 2(M), R.R. at 13a.

[10]  *Id.* § 2(R), R.R. at 13a.

[11]  Majority Op. at 18 (emphasis in original).

the lease does not support the Majority's assertion in every circumstance. Generally, when a tenant invites someone to the tenant's Unit, the invitation also invites the person onto the Premises. However, the Majority overlooks the fact that one may already be "on the Premises," presumably at the invitation of one tenant, before being invited into the Unit of a different tenant. Under the plain language of the definition of OPTC, such a person is not "on the Premises . . . *because of an invitation from [this second] Tenant*."[12]

There are two scenarios in which a tenant might invite a person into his or her Unit. In the first, a tenant might invite a person, who is not currently on the Premises, to the Unit, thereby necessarily inviting the person onto the Premises in order to access his or her Unit. In the second scenario, a tenant sees a person in the building or in the housing complex, perhaps in a hallway or the lobby, and invites that person into his or her Unit. That person already was "on the Premises."

We do not know if Nash invited the shooter onto the "Premises." It seems more likely that the shooter's girlfriend invited the shooter onto the Premises.[13] By virtue of the "open house," Nash might be deemed to have invited the shooter into her Unit. Under the plain language of the lease, the shooter became an OPTC only by virtue of the first invitation onto the Premises. Since we do not know who that inviter was, the shooter may never have been an OPTC as to Nash.

The lease imposes strict liability upon a tenant for prohibited activities by another person when the latter was "*at the time of the activity in question* on the Premises" because of the tenant's invitation.[14] At the time of the shooting, the shooter was, presumably, on the Premises because of an invitation from his girlfriend *and* in Nash's

---

[12]     HACP Lease, § 2(L) (emphasis added).

[13]     *Supra* n.9.

[14]     HACP Lease, § 2(L) (emphasis added).

Unit because of an invitation (whether real or constructive) from Nash. Two invitations likely existed here, and they remained in effect simultaneously. We can assume that only the girlfriend's invitation caused the shooter to be "on the Premises."[15] Nash's invitation did not cause the shooter to be on the Premises if he was already there. The lease does not impose strict liability upon a tenant who invites a person already on the Premises into the tenant's Unit. The lease imposes strict liability upon a tenant for the acts of persons that the tenant brings onto the Premises.

In order to make the shooter a "Covered Person" as to Nash, the Majority adds language to the definition of an OPTC. The Majority suggests that the definition of OPTC includes persons on the Premises or in the Unit because of the tenant's invitation.[16] However, the definition of OPTC does not include persons who are in the Unit because of the tenant's invitation into the Unit. The Majority also asserts that, within the definition of OPTC, the phrase "because of an invitation from Tenant" means, in effect, "because of an invitation or an invitation to stay or remain from Tenant."[17] The Majority adds words to the lease to which the parties did not agree. When a person is invited to stay or remain in a place, he or she necessarily already was in that place because of a prior invitation. A person is only an OPTC as to a tenant if he or she is "on the Premises . . . because of an invitation" from that tenant. A person who is invited to stay or remain on the Premises by another tenant is not an OPTC as to that tenant because that person already was on the Premises by virtue of the previous invitation.

---

[15]    *Id.*

[16]    The Majority opines that "[a]n invitation to a Unit **is** an invitation to the Premises, because the Unit **is part of the Premises**." Majority Op. at 18 (emphasis in original).

[17]    *See* Majority Op. at 19 ("This also means that an invitation from one Unit on the Premises to another Unit is an invitation to stay or remain on the Premises.").

Any doubt is removed by Section 9(M) of the lease. That section provides that "[i]t shall be considered a material breach of Tenant's Lease and specific grounds for termination of this Lease if any 'Covered Person' does any of the following in the Unit or on the Premises[.]"[18] If committing these offenses "on the Premises" already encompassed committing the offenses in the Unit, then the phrasing of Section 9(M) is redundant. The Majority fails to construe the lease as a whole, and fails to give effect to every word.[19]

As the Commonwealth Court held, "[a]n invitation to enter a Unit is not the same as an invitation to enter the Premises."[20] The lease limits the definition of OPTC to those invited by the tenant in question onto the Premises. The Commonwealth Court's holding is based upon the plain language of the contractual definition. Even if we go beyond plain language and consider the reasons for the provision and the consequences of the lower court's interpretation, there is nothing absurd in the Commonwealth Court's reading, the Majority's suggestion notwithstanding.[21] Instead, that reading mitigates the life-altering consequences that strict liability imposes upon a tenant for the unanticipated criminal activity of others. It is the initial tenant's invitation onto the Premises that introduces a risk to the public housing community. Inviting a person who is already on the Premises into one's Unit does not increase the risk that the person will engage in criminal activity

---

[18]   HACP Lease, § 9(M), R.R. at 21a.

[19]   *Mowry v. McWherter*, 74 A.2d 154, 158 (Pa. 1950) ("It is well settled doctrine that a contract must be construed as a whole . . . it being necessary to consider all of its [parts] in order to determine the meaning of any particular part as well as of the whole. Individual clauses and particular words must be construed in connection with the rest of the agreement, and all parts of the writing, and every word of it, if possible, will be given effect.").

[20]   *Nash*, 2023 WL 8009066, at *4.

[21]   Majority Op. at 18.

to the detriment of the community, beyond any risk created by the other tenant's initial invitation onto the Premises. We should not rewrite the lease to help the Housing Authority, the drafter, broaden the scope of activities that carry strict liability.

The Majority observes that "the Commonwealth Court would have us focus on the chronology of events, making the only relevant inquiry be who is responsible for inviting this bad actor to Northview Heights in the first place."[22] There is nothing absurd in limiting strict liability to the party who performed the act that created the risk.

The Majority thinks it absurd that, under the Commonwealth Court's rationale, the "[s]hooter's girlfriend's Unit would be the only location considered to be part of the Premises, whereas Nash or any other Tenant's Unit would not be considered part of the Premises merely because of the timing of an invitation."[23] The Majority misconstrues the consequences of the Commonwealth Court's interpretation. Nash's Unit, other tenants' Units, and the common areas unequivocally are "part of the Premises." Nash's invitation into her Unit (or any other tenants' invitations into their Units) would not constitute an invitation onto the Premises for purposes of defining an OPTC. The shooter was already on the Premises by way of the first invitation. The cause of the shooter's presence on the Premises likely was the girlfriend's initial invitation, no matter if second or third invitations into individual Units followed. The girlfriend's Unit would not be the "only location considered to be part of the Premises."[24] Rather, her invitation would be the only one considered to be an invitation onto the Premises.

Assume, *arguendo*, that the girlfriend invites the shooter onto the Premises, where the shooter happens to know multiple tenants. The shooter stops into Nash's Unit for

---

22      *Id.*

23      *Id.*

24      *Id.*

some cake, and is then invited into another Unit by that Unit's tenant. As he moves along, the shooter is invited into a third tenant's Unit to borrow an umbrella because it has started to rain. The shooter then kills someone in the stairwell. The Majority's analysis, which asserts that an invitation into the Unit is an invitation onto the Premises, or an invitation to stay on the Premises, would dictate that the shooter was an OPTC for each of the tenants, each of whom necessarily would be strictly liable for the shooter's crime because of the multiple invitations into the Units. The Majority would hold that the Housing Authority could evict all of the tenants, despite the fact that only the girlfriend's invitation caused the shooter to be on the Premises. That is far more absurd than concluding that Nash's invitation into her Unit was not an invitation onto the Premises, when the shooter was already on those Premises. Under the Commonwealth Court's interpretation, only the first person to invite the shooter onto the Premises would be subject to strict liability under the lease. I do not view that as an absurd result.

The plain language suffices to answer the question before us. However, even if there were ambiguity, then the Majority's analysis fails to construe the agreement against the drafter as required by ordinary principles of contract interpretation.[25] The Housing Authority drafted this lease. It elected not to expand strict liability to tenants who invite bad actors into their Units or invite bad actors, initially invited onto the Premises by someone else, to stay or remain on the Premises. Construing OPTC to include only persons that a tenant invites onto the Premises works against the drafter, rather than Nash, and appropriately so.

The Majority has disregarded the plain language of the lease in order to conclude that an invitation to a Unit is always an invitation to the Premises, observing that the Unit

---

[25] *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006).

is part of the Premises.[26]  Although an invitation to a Unit can be an invitation onto the Premises, this is not necessarily so.  Nash's invitation into her Unit likely was not an invitation onto the Premises.  The lease is to be construed according to its plain terms.  In the alternative, if one assumes the language is less than clear, this Court should construe any perceived ambiguity against the drafter.  Had the Housing Authority intended an OPTC to include a person invited into the Unit, it could have drafted the lease to say so, as it did in other provisions.[27]  Further, because crucial information is missing from the record, the Housing Authority failed to prove that Nash invited the shooter onto the Premises.  I would affirm the Commonwealth Court's unanimous decision, which reversed Nash's eviction.

Accordingly, I respectfully dissent.

Justice Dougherty joins this dissenting opinion.

---

[26]     Majority Op. at 18.

[27]     The Housing Authority included the phrase "in the Unit or on the Premises" in § 2(M).  HACP Lease, § 2(M).